UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Karen Bostek,                                              Case No. 3:16-cv-2416

               Plaintiff

      v.                                                         MEMORANDUM OPINION

Norfolk Southern Railway Company, et al.,

               Defendants

### I.    INTRODUCTION

Before me is Defendant Norfolk Southern Railway Company's motion for summary judgment. (Doc. No. 38). Plaintiff Karen Bostek filed a memorandum in opposition, (Doc. No. 41), and Defendant replied, (Doc. No. 42).

### II.    BACKGROUND

Plaintiff Karen Bostek was employed by Defendant Norfolk Southern Railway Company ("NSR") for approximately seventeen years. In August 2014, Bostek failed a "fitness for duty" drug test and was required to participate in a drug-education program in order to maintain her employment. As a condition of the program, Bostek was subject to random drug tests for the next five years.

The first of these random drug tests was conducted on February 4, 2015, by Rebecca Smith, who is federally certified to perform drug and alcohol tests. (Doc. No. 41-1 at 18; Doc. No. 41-5 at 4, 8). Pursuant to Smith's general practice, she asked Bostek for photographic identification during the test.

Only a few weeks after this first test, on February 26, 2015, Smith returned to perform a follow-up test. When Smith appeared in Bostek's office to perform the test with NSR management personnel Stephen Grankowski, Bostek informed Smith she would have to go out to her car to retrieve her license. Because Smith was required to keep Bostek in her sight for the duration of the test, Smith followed Bostek out of Bostek's second floor office and onto an outdoor, grated, metal staircase to the parking lot. It was snowing at the time, and snow had accumulated on both the single handrail and the stairs themselves.

Bostek took three steps down the staircase before she slipped and fell on the third step. Smith immediately asked Bostek whether she was alright and pounded on the door to summon Grankowski. Bostek then made her way back up the stairs and into her office where Smith gave her an ice pack in response to her complaints of shoulder pain. Grankowski then took Bostek to the hospital to be treated for her injuries. Smith remained at the site until Superintendent Stephen Myrick arrived at the scene. Myrick then took Smith's written statement and drove her back to her car.

Although Smith was going to go home after this incident, she was instructed to go to the hospital to complete the test. Smith did as instructed.

At the time Smith attempted to conduct the drug test in the hospital, Bostek was wearing a neck brace, "moaning and groaning" while lying in a hospital bed in a curtained off area of the emergency room. (Doc. No. 41-5 at 25, 34). The first sample Bostek produced did not fulfill the volume requirement for urinalysis. After the first sample, Bostek was given an injection of morphine for her pain. She was also given a forty-ounce cup of water to help her produce a sufficient urine sample. Though Bostek took a couple sips of the water and produced some urine, neither of the samples taken over the next two hours satisfied the volume requirement for urinalysis.

Since Bostek was unable to produce a sample of the requisite volume in any of the three samples given over three hours, the test resulted in a "shy bladder refusal." (Doc. No. 41-5 at 22).

Other than the drug test itself, the details of the hospital visit are not clear. But it is known that after x-rays and CT scans were performed, Bostek was discharged with a diagnosis of shoulder contusions.

Myrick, who was investigating the incident, was present for much of the time Bostek was in the hospital. But, due to the circumstances, he was unable to question Bostek at the hospital. Instead, he questioned Bostek in an unrecorded phone call the following day.

The NSR medical department also attempted to communicate with Bostek in the days following the incident to notify her of a Shy Bladder Exam, which was required to assess whether there was a medical reason for Bostek's inability to produce the requisite volume of urine in any one sample over the three-hour period. Though the medical department made numerous attempts to notify Bostek of the Shy Bladder Exam scheduled for March 2, 2015, it was unable to reach her until March 1, 2015. During the call, Bostek notified NSR that she had a doctor's appointment scheduled for the same day, which could conflict with the scheduled exam. Despite being notified of the conflict, NSR did not offer to reschedule the test. And on March 2, 2015, Bostek chose to attend her doctor's appointment rather than the Shy Bladder Exam.

Four days after she failed to appear for the Shy Bladder Exam, on March 6, 2015, NSR sent Bostek two letters notifying her of the following charges:

> (1) "violation of NS Operating Rule 4(a), violation of the NS Policy on Alcohol and Drugs and conduct unbecoming an employee in that you failed to follow the instructions of NS Medical Director Dr. P. J. Lina, in her letter to you dated February 27, 2015, to report for a medical assessment on March 2, 2015, after failing to provide a sample for a February 26, 2015, follow-up test as instructed in her November 29, 2014 letter."
>
> (2) "conduct unbecoming an employee in that you made false and/or conflicting statements to a Carrier Officer, while on duty as an Operator at River Route Bridge, at approximately 3:48 P.M. on February 26, 2015."

(Doc. No. 41-21 at 2 -3). For both charge investigations, Myrick was the charging officer and Jason Charbonneau the hearing officer. As charging officer, it was Myrick's responsibility to present the case on behalf of the company, including documents and testimony to support the case. The hearing officer is charged with conducting a fair and impartial hearing. Ultimately, Charbonneau found Bostek guilty on both charges and dismissed her from service for each.

### III.  STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.  DISCUSSION

The Federal Railroad Safety Act ("FRSA") prohibits a railroad carrier from retaliating against an employee who has, in good faith, engaged in a protected activity. 49 U.S.C. § 20109(a). Claims under the FRSA are analyzed under the same burden-shifting framework as those asserted under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century. 49 U.S.C. § 20109(d)(2)(A)(i). That is, the employee must first make a *prima facie* showing that:

> (1) [she] engaged in protected activity; (2) [NRS] knew that [she] engaged in protected activity; (3) [she] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action.

4

*Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. 2014) (citing *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013)); *see also* 49 U.S.C. § 42121(b)(2)(B)(i).  Once the employee satisfies the initial burden, the employer must "demonstrate[], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior."  49 U.S.C. § 42121(B)(2)(B)(ii); *see also Consol. Rail Corp.*, 567 F. App'x at 337.

## A. *PRIMA FACIE* SHOWING

While there is no dispute that notifying a railroad carrier of a work-related injury is a protected activity, 49 U.S.C. § 20109(a)(4), NSR alleges the injury report was not made with the requisite "good faith."  Additionally, NSR claims Bostek cannot establish her engagement in a protected activity was a "contributing factor" in NSR's decision to terminate her employment.

### 1. Good Faith

"[T]he 'good faith' requirement of the statute incorporates both a good faith belief that an injury was work-related, and good faith in making the injury report."  *Miller v. CSX Transp., Inc.*, No. 1:13-cv-734, 2015 WL 5016507, at *6 (S.D. Ohio Aug. 25, 2015) (citing *Murphy v. Norfolk S. Ry. Co.*, No. 1:13-CV-863, 2015 WL 914922, at *5 n. 3 (S.D. Ohio Mar. 3, 2015)).  It is undisputed that Bostek's reported injury occurred at work.  As such, the remaining question is whether Bostek "submitted the report with good faith intent."  *Miller*, 2015 WL 5016507, at *6.

NSR asserts the report was made not in good faith but with the "ulterior motive" of avoiding the random drug test.  (Doc. No. 38-1 at 18-19).  In support, NSR cites statements Bostek made which conflict with the accounts of others who were present during or after the incident.  (*Id.*).  Specifically, NSR alleges Bostek falsely claimed: (1) the stairs were icy and snow-packed; (2) she slipped halfway down the staircase; and (3) she was covered in snow after the fall.  (*Id.*).  Bostek

acknowledges the inconsistencies between her own account and that of others but contends these "minor facts" do not equate with a lack of good faith. (Doc. No. 41 at 19).

At this stage in the litigation, it is not my function "to weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. Rather, I must view the evidence in the light most favorable to Bostek and determine only whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Here, Smith testified that there was snow on the steps that had not fallen through the grates at the time of the accident. (Doc. No. 41-17 at 3-4). While she said "[i]t didn't seem dangerous to [her,]" she "was cautious." (*Id.* at 4). Additionally, though Smith asserted "[t]here was no snow buildup, no ice buildup, nothing[,]" two questions later, she stated, "[t]here was just a little bit of snow buildup on the sides and stuff." (*Id.* at 9). Grankowski also testified to the accumulation of snow on the steps and the handrail. (Doc. No. 41-4 at 12). And, even Myrick admitted there was snow on the lip of the steps, which is corroborated by the photo he took an hour after the incident. (Doc. No. 41-3 at 16; Doc. No. 41-25).

As such, without considering Bostek's "self-serving testimony," as described by NSR, (Doc. No. 38-1 at 19), the jury could reasonably conclude the stairs had accumulated snow, snow which would have covered Bostek's clothes when she fell. Further, although Bostek's statement that the stairs were icy is not corroborated, there is sufficient evidence of accumulation to conclude the statement was made not in bad faith but merely confusion.

Regarding the details of the fall itself, Bostek and Smith both recalled Bostek slipping on the third step down. (Doc. No. 38-12 at 35; Doc. No. 41-17 at 5). But their accounts diverge as to whether Bostek continued to fall down the steps. Bostek claimed she went down an additional five stairs. (Doc. No. 38-12 at 33, 35). Smith recalls Bostek landing on the third step with her legs extended to the steps below, which could arguably be characterized as Bostek's body having

6

extended below the third step.  (Doc. No. 41-17 at 5-6).  Considering Bostek's likely surprise during and following the fall, a genuine dispute of fact exists as to whether this inconsistency was a product of bad faith.

Because Smith's eyewitness testimony and Bostek's account and hospital records, (Doc. No. 41-11), support a conclusion that Bostek fell and was injured, a jury could reasonably conclude Bostek reported her injury in good faith.

**2.      Contributing Factor**

The "contributing factor" prong of the analysis is a matter of much debate among courts. Most circuits who have encountered this issue have determined the employee must show "retaliation was *a* motivating factor" to satisfy this prong.  *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (emphasis in original); *see also Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir 2017) ("[T]to establish a prima facie case, [the FRSA plaintiff] must demonstrate that [the railroad carrier]'s discipline was, at least in part, intentional retaliation prompted by his injury report."); *Lowery v. CSX Transp., Inc.*, 690 F. App'x 98, 101 (4th Cir. 2017) (holding the "contributory factor" prong was satisfied by proof of "retaliatory animus").  But some courts have followed the Third Circuit's holding that a FRSA plaintiff "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action."  *Araujo*, 708 F.3d at 158 (emphasis in original) (further citation omitted).

The Sixth Circuit has yet to address whether proof of retaliatory animus is required to establish the "contributory factor" prong.  In *Consolidated Rail Corp.*, the court quoted the Third Circuit, stating, "the contributing factor standard has been understood to mean 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" 567 F. App'x at 338 (quoting *Araujo*, 708 F.3d at 158).  But, in concluding the employee had

established this prong, the court stated there was "substantial evidence that animus was a contributing factor." *Id.* Thereafter, the Eighth Circuit cited this conclusion in support of the statement that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk*, 768 F.3d at 791.

Without a definitive ruling, many trial courts within the Sixth Circuit have considered the following factors when faced with the "contributing factor" analysis proven by circumstantial evidence:

> (i) temporal proximity; (ii) indications of pretext; (iii) inconsistent application of an employer's policies; (iv) shifting explanations for an employer's actions; (v) antagonism or hostility toward a complainant's protected activity; (vi) falsity of an employer's explanation for the adverse action taken; and (v[ii]) change in the employer's attitude toward the complainant after he engages in protected activity.

*Gibbs v. Norfolk S. Ry. Co.*, No. No. 3:14-cv-587, 2018 WL 1542141, at *8 (W.D. Ky. Mar. 29, 2018) (quoting *Wagner v. Grand Trunk W. R.R.*, No. 15-10635, 2017 WL 733279, at *4 (E.D. Mich. Feb. 24, 2017)) (further citation omitted); *see also, Ma v. American Elec. Power, Inc.*, 123 F. Supp. 3d 955, 963 (W.D. Mich. 2015) (considering temporal proximity, change in attitude, and hostility toward protected activity); *Ortiz v. Grand Trunk W. R.R. Co.*, No. 13-13192, 2014 WL 4658762, at *7 (E.D. Mich. Sept. 17, 2014) (enumerating *Gibbs* and *Wagner* seven factors). I, too, find these factors applicable to the "contributing factor" inquiry.

   **1.   Temporal Proximity**

Bostek alleges this prong can be inferred by the temporal proximity between her protected-activity injury report and her dismissal. But Bostek was terminated for two independent charges: failure to attend the Shy Bladder Exam, as scheduled, and making false and conflicting statements in her injury report. (Doc. Nos. 38-3 & 38-4). These charges were leveled against Bostek on March 6, 2015, approximately four days after Bostek failed to attend the Shy Bladder Exam and six days after

8

making her injury report to Myrick.[1] (Doc. Nos. 38-3, 38-4, 41-21). Although six days is a relatively short period of time, the intervening event diminishes inference of retaliation from temporal proximity. Therefore, this factor is not highly probative.

### 2. Procedural Irregularities of Drug Tests

Although the Shy Bladder charge and false and conflicting statements charge must be distinguished for purposes of the temporal proximity factor, the two events giving rise to the charges are, to an extent, intertwined. This relationship between the two, Bostek argues, gives rise to an inference of retaliation. In support, Bostek cites multiple Department of Transportation ("DOT") drug testing guidelines and Federal Railroad Administration ("FRA") regulations, which NSR violated following Bostek's on-duty injury. (Doc. No. 41 at 22-23). Apparently conceding these alleged violations, NSR merely argues they are immaterial since Charbonneau was not involved in the drug testing process itself. (Doc. No. 42 at 7). I will briefly discuss these alleged violations.

First, guidelines require the donor to be within the sight of the collector or a member of employer management for the duration of the drug test. (Doc. No. 41-4 at 8-9; Doc. No. 41-5 at 9, 17-18). But Bostek was out of Smith's sight for "about an hour" during the test when Bostek was transported to the hospital by Grankowski. (Doc. No. 41-4 at 13; Doc. No. 41-5 at 9, 17). Further, Bostek was out of Grankowski's sight for a period of time during this hour as well. (Doc. No. 41-4 at 14). Even if this was not a "fatal flaw," as Smith alleged, it was a departure from the general procedure. (Doc. No. 41-5 at 18).

Second, the DOT Urine Specimen Collection Guidelines provides that, "[i]f an employee needs medical attention (e.g., an injured employee in an emergency medical facility who is required to have a post-accident test), treatment takes priority and should not be delayed to collect a

---

[1] The charging letter states the false and conflicting statements were made February 26, 2015. (Doc. No. 41-21 at 3). But the charge was based on allegedly false statements Bostek made to Myrick during her verbal injury report on February 27, 2015. (Doc. No. 41-1 at 53).

specimen." Office of Drug & Alcohol Policy & Compliance, U.S. Dep't of Transportation, *Urine Specimen Collection Guidelines* (2014) (provided as Doc. No. 41-9 at 26). But rather than prioritizing Bostek's treatment, NSR continued to pursue the drug test while Bostek was in the hospital seeking treatment. (Doc. No. 41-4 at 16).

Third, FRA regulations provide that "a collector…must…[u]rge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen." 49 C.F.R. § 40.193(b)(2). But rather than a reasonable distribution, Bostek was given a "tall cup of water," approximately 40 ounces, all at once. (Doc. No. 41-5 at 28-29).

Finally, after an employee has failed to provide the requisite volume of urine, FRA regulations require the employer to "direct the employee to obtain, within five days, an evaluation" regarding the "employee's failure to provide a sufficient specimen." 49 C.F.R. § 40.193(c). NSR did not direct Bostek to obtain the evaluation within five days of the failure, but instead demanded Bostek appear for the Shy Bladder Exam on March 2, 2015. (Doc. No. 38-5 at 45-46; Doc. No. 38-9 at 28). Even though the five days did not expire until March 3, 2015, when learning of the conflict between Bostek's doctor's appointment and the test, NSR did not offer to reschedule for the following day or inform Bostek of any other way this evaluation could be satisfied. (Doc. No. 38-9 at 67).

Although Charbonneau was not directly involved in the drug testing and Shy Bladder Exam, he did nothing to remedy NSR's errors. Instead, Charbonneau repeatedly stated his limited purpose:

> I wasn't there to evaluate whether or not Ms. Bostek had a doctor's appointment. I was there to evaluate whether Ms. Bostek failed to comply with the instructions from the proper authority.

(Doc. No. 41-27 at 9-10). That is, Charbonneau's only purpose was to determine whether Bostek had appeared at the scheduled Shy Bladder Exam, as evidenced by the following exchange during the investigation:

> Charbonneau: Mr. Myrick, was Ms. Bostek instructed to report for a medical assessment on March 2, 2015?
> Myrick: Yes, Medical Department had given her those instructions.
> Charbonneau: Did Ms. Bostek show up for the medical assessment on March 2, 2015?
> Myrick: No.
> Charbonneau: Mr. Myrick, did Ms. Bostek follow the instructions in the letter dated February 27, 2015? I'm referring to Exhibit # 11.
> Myrick: No, she did not follow instructions.
> Charbonneau: Mr. Myrick, *did* Ms. Bostek comply with the NS Operating Rule 4(a)?
> Myrick: No, she did not.
> Charbonneau: Mr. Myrick, was Ms. Bostek in violation of NS Policy on Alcohol and Drugs?
> Myrick: Yes.

(Doc. No. 38-9 at 33-34). Unsurprisingly, since it was never disputed that Bostek did not appear for the scheduled Shy Bladder Exam, Charbonneau found Bostek guilty as charged. (Doc. No. 38-3).

Based on the evidence presented of NSR's disregard of DOT guidelines and FRA regulations coupled with the ultimate futility of the hearing, a question of fact remains as to whether the continued drug testing, Shy Bladder Exam, and subsequent investigation were legitimate or an act of pretext.

### 3. Indications of Pretext/Hostility by Myrick

Bostek asserts Myrick acted with pretext when he suppressed evidence of Smith's eyewitness testimony. (Doc. No. 41 at 22). In support Bostek cites the following exchange during the Shy Bladder investigation:

> Bostek: Statements from the witnesses, are we allowed that?
> Myrick: I don't have any statements from the witnesses.
> Bostek: Grankowski. or the FRA testing officer Rebecca, I mean don't they have to provide written statements as I do?
> Myrick: No. Mr. Grankowski is outside to be questioned. That's why he's here.
> Bostek: I understand, but Rebecca the --
> Myrick: --We can't. Rebecca Smith does not work for Norfolk Southern.

11

>     Bostek: I understand, but she was a witness.
>     Myrick: Correct.
>     Bostek: She's not required to provide any type of a statement as to what she witnessed?
>     Myrick: I can't make her provide a statement. She doesn't work for NS.
>     Bostek: Okay. I'm just asking if--
>     Myrick: --Yeah, she doesn't really want to get involved. So I can't make her--
>     Bostek: --Can't blame her.
>     Myrick: Yeah. She doesn't really want to give a written statement.

(Doc. No. 38-9 at 45-46). But Smith had given a written statement, a statement Myrick described as "consistent with what little information Ms. Bostek would offer." (Doc. No. 41-3 at 8). Further, though Myrick claimed NSR wanted Smith "to come to [the false and conflicting statements] disciplinary hearing and she would not[,]" (Doc. No. 41-3 at 28), Smith testified that she had expressed her willingness to give a statement at the hearing but was never asked to do so. (Doc. No. 41-5 at 14).

Rather than presenting Smith's written statement or her personal testimony, Myrick testified that Smith told him Bostek "sat on the steps, was her exact words." (Doc. No. 38-12). But in Smith's three[2] personal accounts presented as evidence here – her written statement given after the accident, her recorded interview with the NSR claims agent, and her deposition for this litigation – Smith never used these words, but instead described Bostek's "fall."

Beyond suppression of evidence, there is evidence that Myrick acted questionably throughout the investigation into Bostek's on-duty injury. First, from the beginning, Myrick classified the incident as a "slip no fall," even though Smith reported Bostek had slipped and landed

---

[2] Smith's declaration provided by NSR states that Bostek "gently sat down on the middle of the third step…[s]he did not fall." (Doc. No. 38-6 at 3). But this declaration, in whole, contains inconsistencies. For example, NRS's statement that "there was no accumulation of snow on either the stairs or the single handrail," is directly contradicted by the testimony of not only Smith, but also Grankowski and Myrick, as discussed above. Further, even if Smith did feel this way at the time, she never expressed a belief that the fall was faked on the record in her written statement or account to the claim agent. (Doc. No. 41-5 at 21). Instead, she expressed this for the first time in this particular declaration signed at least seven months after the incident. (Doc. No. 38-6; Doc. No. 41-5 at 27, 33-34).

on her bottom. (Doc. No. 41-3 at 18; Doc. No. 41-8). Though Myrick was at the hospital when Bostek was diagnosed with and treated for contusions, he refused to believe Bostek actually fell and was injured, stating:

> My experience, when you go to the doctor and you tell them I've got A, B, C, D wrong with me and a contusion, they can't see a contusion, they're going to give you treatment based on what you're telling them, even though they can't run tests to see.
> What she was telling them was very subjective. They're giving her treatment. Oh, my shoulder hurts, so she ends up with a neck brace, she ends up with two shots of morphine, that I'm aware of, for a bruise? They're giving her based on what she is telling them.

(Doc. No. 41-3 at 21). Myrick never reviewed Bostek's medical records to confirm or deny his theory that she was not injured. (Doc. No. 41-3 at 7, 20).

Acting on his personal beliefs, Myrick brought charges against Bostek for making false and conflicting statements when reporting her injury. Though Bostek's union representative asked Myrick multiple times to specify the allegedly false and conflicting statements that formed the basis of this charge, he did not provide these details prior to the hearing. (Doc. No. 41-24). As a result, Bostek was unable to adequately prepare for the hearing.

Ultimately, because Myrick withheld evidence from both the hearing officer and Bostek herself, the false and conflicting statements hearing was, in Myrick's words, a "he said she said" situation. (Doc. No. 38-12 at 15). Because there is evidence to suggest Myrick's hostility stemmed directly from the injury report, and his conduct impacted the investigation resulting in Bostek's dismissal, a jury could reasonably conclude the injury report was a "contributing factor" of NSR's decision to terminate Bostek.

### 4. Indications of Pretext/Falsity of Explanation by Charbonneau

Bostek asserts Charbonneau's decision to dismiss her for false and conflicting statements was pretextual. Specifically, Bostek asserts the single statement Charbonneau[3] cited as false or conflicting – that Bostek slid halfway down the stairs rather than landing on the third step, (Doc. No. 41-27 at 14-15, 19) – was insufficient to justify her termination. Considering the lack of direct evidence provided in support of the charge along with Charbonneau's simplistic explanation of his decision to terminate, a fact question remains as to whether his explanation was false and his decision pretextual.

In sum, NSR's conduct from the initial drug test to the Shy Bladder investigation, along with Myrick's hostility, and the indications of possible pretext by both Myrick and Charbonneau, suggest Bostek's injury report was a "contributing factor" in NSR's decision to terminate Bostek.

### B. DISMISSAL ABSENT INJURY REPORT

Because Bostek satisfied her *prima facie* burden, the burden shifts to NSR to prove by clear and convincing evidence that Bostek would have been terminated even if she had not made the injury report. Here, NSR states that it would have terminated Bostek for failing to appear for the Shy Bladder Exam independent of her injury report and that it would have dismissed her for making false statements even if the statements were not contained in the injury report. In support, NSR cites voluminous records purporting to show its dismissal of other employees found guilty of similar charges.[4] (Doc. Nos. 38-17 & 38-19).

---

[3] As an aside, inconsistent statements about the relationship between Myrick and Charbonneau at the time of the hearing also raise some suspicion. Although Myrick claims he "didn't even know" Charbonneau prior to the hearing, (Doc. No. 41-3 at 10), Charbonneau testified that he had known Myrick for years prior to the hearing and had sat, as the hearing officer, on one case prior to Bostek's where Myrick was the charging officer. (Doc. No. 41-27 at 6).

[4] NSR also provided records of cases involving employees who were found not to have a medical condition which would have caused them to fail to provide the required sample during the three-hour period. (Doc. No. 38-18). Because NSR never made this determination with respect to

14

With respect to the charge of making false and conflicting statements, all four cases provided for comparison are easily distinguishable. (Doc. No. 38-19). In two of the cases, the employee admitted to making false statements. (*Id.* at 5-9). In one case, the objective evidence demonstrated the employee was not working six days he claimed to incur work-related transportation and meal expenses. (*Id.* at 2-3). And in the last case, "the record was devoid of any explanation" of the alleged false statements because the employee chose not to attend the hearing and present an explanation. (*Id.* at 4). Bostek never conceded guilt, but instead maintained her innocence during a subjective "he said she said" investigation. Additionally, as an aside, the employees in the cited cases falsified expense accounts and track inspection records, "forged a doctor's signature," and "st[ole] time not worked." (*Id.* at 2-9). Bostek is accused of falsifying the number of steps she fell.

Regarding the failure to appear for the Shy Bladder Exam, NSR cites numerous cases in which employees refused a drug test. But there is no evidence Bostek refused to take the Shy Bladder Exam, only that she notified NSR she could not attend the exam at the scheduled time due to a previously scheduled doctor's appointment. With knowledge of the conflict, NSR did not offer to reschedule the test for the day after, March 3, 2015, even though FRA regulations permitted Bostek five days to take the Shy Bladder Exam. NSR did not act with the same rigidity in the cases provided by NSR as evidence. In fact, in one case, NSR "changed one date and…suggested subsequent dates for a retest." (Doc. No. 38-17 at 7). As such, these records do not provide clear and convincing evidence Bostek would have been fired absent the injury report.

As discussed above, there were flaws in every stage of the Shy Bladder matter from the initial drug test itself, to the scheduling of the Shy Bladder Exam, to the resulting investigation. Viewing

---

Bostek, these records are irrelevant. As stated repeatedly by Charbonneau, "I wasn't there to evaluate whether or not Ms. Bostek had a doctor's appointment. I was there to evaluate whether Ms. Bostek failed to comply with the instructions from the proper authority." (Doc. No. 41-27 at 9-10). The medical reason for failing to supply the required sample was not at issue.

15

all of this evidence in the light most favorable to Bostek, I conclude NSR has fallen short of its burden here. Summary judgment as to the retaliation claim must be denied, accordingly.

**C.     DAMAGES**

NSR moved for summary judgment on its affirmative defenses regarding Bostek's failure to mitigate her damages and Bostek's request for punitive damages. (Doc. No. 38-1 at 24-25).

In response to NSR's motion, Bostek provided evidence that she has sought to mitigate damages by applying for employment at numerous locations. (Doc. No. 41-29). NSR remained silent on the mitigation issue in the face of this evidence. Thus, I conclude a genuine dispute of material fact remains as to the damages-mitigation issue.

Regarding punitive damages, NSR alleges Bostek has failed to provide "proof of malicious or reckless conduct by the railroad." *Murphy*, 2015 WL 914922, at *6 n.4 (cited in Doc. No. 38-1 at 25; Doc. No. 42 at 8). NSR claims, specifically, that "the evidence shows that NSR's conduct was wholly intended to follow the law." (Doc. No. 38-1 at25). But the evidence suggests NSR violated numerous DOT guidelines and FRA regulations throughout the drug testing process. Further, there is evidence of Myrick's deceptive and biased conduct during the investigations which resulted in Bostek's termination. Finally, a jury could reasonably conclude the Shy Bladder investigation was nothing more than a formality, predetermined to result in a finding of guilt. Therefore, a genuine issue of material fact exists as to whether NSR engaged in malicious or reckless conduct, entitling Bostek to punitive damages.

Accordingly, summary judgment is denied for both of these damages-related affirmative defenses.

# V. INTERFERENCE CLAIM

In opposition to summary judgment, Bostek alleges she stated a claim not only for retaliation, but also for interference with prompt medical attention under 49 U.S.C. § 20109(c), which provides:

> (1) Prohibition.--A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.
>
> (2) Discipline.--A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician… For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

49 U.S.C. § 20109(c).

The liberal pleading standard that applies at the outset of the litigation does not apply at the summary judgment stage. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787-88 (6th Cir. 2005). To ensure a defendant is not subject to unfair surprise at this late stage, "a plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 689, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). But, in the face of an ambiguous complaint, the Sixth Circuit has looked to the "course of the proceedings" to determine whether the defendant was on notice of the claim. *Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 435 (6th Cir. 2012) (quoting *Carter v. Ford Motor Co.*, 561 F.3d 562, 568-69 (6th Cir. 2009)).

Bostek's amended complaint, claiming only "Count I: Violation of 49 U.S.C. § 20109 (FRSA)" is not ambiguous. (Doc. No. 3). Though the amended complaint does not cite a

subsection of FRSA, the language used states only a retaliation claim. Specifically, the amended complaint provides, in relevant part,

> 13. As a result of attempting to formally report these injuries, NS filed disciplinary charges against Plaintiff, claiming that she made false representations and false or conflicting statements.
>
> 14. Plaintiff's actions in attempting to formally report her injuries constituted protected activity under the FRSA.
> …
> 16. The disciplinary charges brought against Plaintiff were false, and the Defendant knew that the charges were false, and yet the Defendant participated in bringing the charges and holding the hearing.
> …
> 18. The false charges that were brought against Plaintiff included, *inter alia*, that she did not fall down; that she was not injured; and that she willingly or effectively refused or failed to take her drug test.
>
> 19. Plaintiff attempted take her drug test three times immediately after the incident, but the Defendant participated in the manipulation of the tests to insure that the tests would be invalid.
>
> 20. Defendant also insisted that Plaintiff provide urine samples despite the knowledge that, despite Plaintiff's best efforts, she was unable to do so. This insistence extended to demanding that the sample be produced while Plaintiff was at the hospital, in significant pain from her injuries.
>
> 21. The Defendant deliberately and maliciously used standards and procedures for urinalysis testing that were inconsistent with federal and industry standards. These improper standards and procedures were calculated to invalidate the urine samples that Plaintiff provided.
> …
> 23. Plaintiff advised NS that her physician instructed her to temporarily not return to work until she could be seen by her physician on March 3, 2015 [sic][5]. Defendant, knowing that Plaintiff's physician appointment was scheduled for March 3, 2015 [sic], intentionally and maliciously ordered her to be seen by an NS appointed doctor on the same date, and prohibited Plaintiff from rescheduling the appointment with NS's physician.
>
> 24. Plaintiff attended the previously scheduled appointment with her personal physician on March 3, 2015 [sic]. Defendant used Plaintiff's attendance at her previously-scheduled personal physician appointment, and resultant failure to present

---

[5] The complaint incorrectly states that the Shy Bladder Exam and conflicting appointment were scheduled for March 3, 2015. (Doc. No. 3). The actual date of these two appointments was March 2, 2015. (Doc. No. 38-5 at 45-46; Doc. No. 38-9 at 28, 33-34; Doc. No. 41-16).

at the subsequently-scheduled NS physician appointment as an additional pretext for firing her.

25. The Defendant took adverse or unfavorable actions against Plaintiff in whole or in part due to her protected activity when they acted to, *inter alia*, charge her with disciplinary offenses based upon her protected activity, subject her to a disciplinary trial, and discharge her without legitimate cause.

(Doc. No. 3. at 3-5).

Bostek cites paragraphs 20 and 23 in support of her argument. Viewed alone, the paragraphs may appear to ambiguously state a claim for interference. But in the context of the entire single-count amended complaint, these allegations are qualified to relate only to the issue of retaliation for reporting her injury. Specifically, Bostek claimed NSR's conduct during the initial drug test was a "manipulation…to insure that the tests would be invalid," and the failure to reschedule knowing she could not attend was merely "additional pretext for firing her." (Doc. No. 3 at 4-5). Further, the amended complaint does not contemplate multiple "violations" of FRSA or use any words triggering an interference claim such as "delay," "deny," "interfere," or "discipline."

While the evidence may suggest Bostek could have alleged a colorable FRSA interference claim, she did not. Nor has she sought leave to amend her amended complaint to add this claim. *See, e.g.*, *Tucker*, 407 F.3d at 789. As it stands, the amended complaint does not adequately state a claim for interference. Therefore, the FRSA interference claim cannot be presented now.

## VI. CONCLUSION

For the foregoing reasons, NSR's motion for summary judgment is denied as to the single count of this litigation: retaliation with the protected activity of reporting an injury. NSR's motion is also denied as to the damages-related affirmative defenses.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge